UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | CRIM. NO. 07-126(DRD) |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| JAVIER FIGUEROA-VEGA, | * | |
| LUIS MONSERRATE VALENTIN, | * | |
| | * | |
| Defendants. | * | |

_____

**OPINION AND ORDER ON NEW TRIAL REQUEST**

I. BACKGROUND

Co-defendants, Javier Figueroa-Vega and Luis Monserrate-Valentín**,** hereinafter referred to as "Figueroa-Vega" and "Monserrate-Valentín" were found guilty by a jury on April 29, 2008[1] of a violation of a Hobbs Act conspiracy under 18 U.S.C. 1951(a), consisting of an interference of commerce via a Loomis Fargo armored car robbery in the amount of $944,000.00 using force, weapons. (Dockets No. 446 and 447, Jury Verdict.)

The court denied the Rule 29 request of dismissal via a written Opinion and Order on December 18, 2008, (Docket   No. 575), expressing therein all the incriminating evidence that existed on the record against both co-conspirators  as to the conspiracy to violate the Hobbs Act, (Docket No. 575,  p. 5-19).  Thereafter, the court denied the request

---

[1] The jury deliberated only eight hours after a trial of fifteen days. See explanation of the court at Docket 577 p. 3. (See Docket 433, the first day Minutes of Proceedings; jury deliberated from 1:00 p.m. to 5:00 p.m.; jury  note #3;  jury begins at 9:30 a.m. the next day and ends deliberation at 1:40 p.m., jury note 4.)

1

as to Bail Pending Sentence requested by co-defendant Monserrate-Valentín on December 22, 2008, (Docket 577), wherein the court again reiterated the salient evidence against the defendant Monserrate-Valentín, (Docket 577 p. 3-6).[2]

Defendant Monserrate-Valentín timely filed a Request for New Trial on October 10, 2008, based on new evidence, the exculpatory identical statements of co-defendants Luis Matos-Montañez and Edgardo Salas-Fernández both having pleaded guilty in the instant case. Edgardo Salas-Fernández was an active live participant on the Hobbs Act assault against the same Loomis Fargo armored car as the defendants Figueroa-Vega. Monserrate-Valentín also participated in the conspiracy through various overt acts described in this opinion.[3] Co-defendant Matos-Montañez was the intellectual co-conspirator of the same Hobbs Act Loomis Fargo armored car robbery on April 30, 2004. Matos-Montañez is a confessed leader of various armored car robberies. (See docket no. 352-2, Plea Agreement; he plead to four Hobbs Act armored car robberies and further described exactly how he performed them. (Docket 463, p. 161-176; Docket 464; Ex. 117, 118, Transcript of court testimony of audio  of Matos-Montañez with informer.  Defendant Monserrate-Valentín later filed an addendum to the motion informing that co-defendants Matos-Montañez and Salas-Fernández would be summoned to testify. (Docket 554.) Thereafter, co-defendant Figueroa-Vega filed a motion joining Monserrate-Valentin's New Trial request on November 17, 2008, (Docket 561). The United States opposed the New

---

[2]     The court now has reviewed for the third time the record, notes some factual errors in our original Opinion and Order, and corrects them in the instant opinion.

[3]     Co-defendant Monserrate-Valentin was not present as a driver or a messenger when the live hit occurred on April 30, 2004 but participated in the conspiracy in various overt acts as explained in the opinion.

2

Trial Motion on November 12, 2008, (Docket No. 559), basically alleging that new trial motions filed by co-defendants were founded on sworn statements of participating sentenced co-defendants have been categorized by the Court of Appeals as "inherently suspect," and should be examined with "skepticism" citing United States v. Montilla, 171 F. 31, 39 (1st Cir. 1999).

Co-defendants Matos-Montañez and Salas-Fernández had already been sentenced, (Dockets 539 and 508), and were no longer serving at MDC Guaynabo, Puerto Rico. Therefore, co-defendants moved to continue the court's original hearing date originally scheduled for January 7, 2009 as defendants would not be available, (Docket 580). The court then advised that co-defendants would be available after January 16, 2009 and set the hearing date for January 23, 2009, (Docket 584). However, on January 23, 2009 counsel José Aguayo, representing co-defendant Matos-Montañez, indicated that he had a conflict of interest as Matos-Montañez was alleging improper representation during plea proceedings and sentencing.[4]  The court was forced to randomly appoint new CJA counsel, allow for time to prepare to the new counsel, and accept the withdrawal of counsel José Aguayo. Counsel Juan Matos de Juan was randomly selected to represent co-defendant Matos-Montañez. The hearing was scheduled for February 19 and 20, 2009, (Docket No.

---

[4]     Matos-Montañez accepted having participated in all Hobbs Act robberies in the indictment as to armored cars but was only sentenced as to one (see Docket No. 353-2, Plea of Matos-Montañez and Docket 539).  Luis Matos-Montañez accepted responsibility as to Count II, a Hobbs Act robbery on 10/25/03 against a Brinks armored car; Count III, a Hobbs Act robbery of 4/30/2004 an overt act in the instant conspiracy; Count IX, a Hobbs Act robbery on 11/7/2005 against a Brinks armored car and Count X, a Hobbs Act robbery against Loomis Fargo armored car dated 3/5/2007. The amounts involved respectively ($103,500; $944,225; $989,580 and $1,275,000).

He also admitted having participated in the April 4, 2004 Loomis Fargo armored car robbery, Ex. 117, and Ex. 118 as to the other robberies of armored cars.

584). The court granted new counsel for Matos-Montañez twenty days to prepare to adequately to represent co-defendant now also a witness, Matos-Montañez.

The court had in the meantime, prior to the new trial hearing, set forth the potential factual scenario, (affidavits had been produced as to the new evidence), first ordering a hearing notwithstanding that convicted co-defendants' statements are deemed "inherently suspect" as participants in the same crime as the co-defendants that went to trial and were found guilty. The new witness produced exculpatory evidence as to the co-defendants on trial all similar to the factual scenario at <u>United States v. Rodríguez Marrero</u>, 390 F.3d 1, 15 (1st Cir. 2004), and the case of <u>United States v. Montilla</u>, 171 F. 3d at 42.  The court entered the following order at Docket 565:

> "Pending before the court is co-defendants Motion for New Trial Based Upon Newly Discovered Evidence, Docket No. 551, and the United States opposition thereto, Docket No. 559. The defendants have obtained sworn statements of two co-defendants also indicted under the same conspiracy [said sworn statements] stating that the later [the new witness co-defendant] did not know of the existence of the two co-defendants [Figueroa-Vega and Monserrate-Valentín] who originally conspired to "hit" a route of an armored truck which was operated by the co-defendants on trial. The co-defendants were then acting allegedly as the "inside men," that is, they were employees operating the armored truck. The two co-defendants already sentenced [Figuerao-Vega and Monserrate-Valentín] have now provided the sworn statements.
>
> The factual scenario in this case is similar to the case of <u>United States V. Fernando Montilla Rivera</u>, 115 F.3d 1060 (1 Cir. 1997) (hereinafter referred to as Montilla I). Although the decision to grant a new trial is within the sound discretion of the District Court, <u>United States V. Montilla Rivera</u>, 171 F.3d 37, 40, (1st Cir. 1999), the First Circuit Court of Appeals recommended to this court at <u>Montilla</u> I that a hearing should be held enabling the court to verify whether a new trial should ensue. The court is aware that post sentencing exculpatory testimony of a co-conspirator already sentenced [in the same case]  is categorized as [testimony] "inherently suspect," <u>United States V. Rodríguez Marrero</u>, 390 F.3d 1, 15 (1st Cir. 2004)  citing <u>United States v. Montilla Rivera</u>, 171 F.3d 42, ("such witnesses have little to lose by fabricating stories designed to free their comrades specially when, as here, the stories do not run the risk of implicating the witnesses [the co-defendants providing the sworn statements] in other criminal acts."

Notwithstanding the court deems appropriate to heed to the advice of the First Circuit in United States v. Montilla Rivera at 115 F.3d 1060. **Hence, a new trial hearing is to be held on January 7, 2009 at 1:00 p.m..** The co-defendants who have provided the sworn statements are to be present.[5].

The hearing was in fact held on February 19-20, 2009, (Dockets 609-2 and 610). The co-defendants Salas-Fernández and Matos-Montañez in essence denied knowing that the two guards, employees of Loomis Fargo of Puerto Rico, as having participated in the crime as "inside men" of the Loomis Fargo armored car robbed at a Texaco gas station on April 30, 2004. The defendants both refused to answer any cross examination question of any significance as to the facts they testified on the grounds of self-incrimination notwithstanding having already been convicted and sentenced as to those same crimes.

At the closing of the hearing, counsel for the moving co-defendants Figueroa-Vega and Monserrate-Valentín requested forty (40) days after the transcript was filed by the court reporter to file post hearing memorandums; the matter of the briefs to be filed was explained to the clients. (Docket 610 p. 45-46.) The transcripts of the two-day hearing were both filed on April 24, 2009, (Docket 609-610).

The court later issued an order on May 14, 2009, (Docket 613), as to a recent opinion by the Court of Appeals on May 12, 2009 on the subject of a new trial request under Fed. R. Cri. P. 33 presenting a similar factual scenario related to the pending motion of new trial in the instant case. The case was United States v. del Valle, 566 F.3d 31 (1st Cir. 2009) (decided on May 12, 2009). The Circuit Court emphasized at said case the doctrine of United States v. Montilla-Rivera, 115 F.3d 1060 (1st Cir. 1997) as to "great

---

[5]        The brackets are added to clarify the order at Docket 565.

skepticism" testimony of convicted co-defendants in the same crime providing exculpatory statements and consequently that the new statements "produced . . . [were required to] result in probable acquittal at retrial"; that is "actual probability that an acquittal would have resulted if the evidence had been available" citing United States v. Sepúlveda, 15 F.3d 1216, 1220 (1st Cir. 1993). The district court also emphasized that the strength of the government's case constituted a critical factor to be examined. The district court in its order then highlighted the inculpatory evidence on the record as to both co-defendants. The court  granted co-defendants ten extra days to file their respective memorandums. The order at Docket 613 dated May 14, 2009, is reproduced herein:

"NOTICE TO COUNSEL

Dated May 12, 2009 the Circuit Court of Appeals entered an Opinion in the case of United States v. Douglas Gorbea del-Valle, ___F. 3d___, (May 12, 2009), which directly impacts the Motion for New Trial of Javier Figueroa Vega and Luis Monserrate Valentín. The case reiterates the doctrine of United States v. Montilla-Rivera, 115 F.3d 1060 (1st Cir. [1997]) that a later affidavit from a co-defendant who asserted his Fifth Amendment privilege at trial is not "**per se insufficient under Rule 33**." Notwithstanding, such evidence must be regarded with "**great skepticism**," since "[i]t is not unusual for the obviously guilty co-defendant to try to assume the entire guilt" (not the fact in this case) and **"[a] convicted, sentenced codefendant has little to lose (and perhaps something to gain) from such testimony."** (Emphasis ours.)  (Co-defendant Matos-Montañez, one of the new witnesses, now has requested the withdrawal of his plea after sentence.)

The case of Gorbea del-Valle emphasizes the necessity of the parties to discuss in a new trial motion that the "**evidence produced will probably result in acquittal upon retrial**," citing United States v. Hernández, 443 U.S. F. 3d 138, 143 (1st Cir. 2006), emphasizing that "**actual probability that an acquittal would have resulted if the evidence had been available**" citing United States v. Sepúlveda, 15 F.3d 1216, 1220 (1st Cir. 1993). (Emphasis ours.)

In the instant case the defendant produced two witnesses[:] co-defendants Luis Matos-Montañez and Edgardo Salas-Fernández both of which had entered pleas and had admitted that the guards ("employees of Loomis Fargo") participated in the crime. Further, co-defendant Matos-Montañez admitted to his participation in all hits

against Loomis Fargo and Brinks in the [sic][his] Plea Agreement, Docket 353-2 p. 10-14; but was only [in reality] sentenced as to one. Moreover, in an audio presented in evidence, Docket [sic] Ex. 117, Matos-Montañez is [seen and] (sic) heard speaking to an informer admitting that the "guards" received money from the Loomis Fargo hit at the Texaco gas station. (Docket 117 p. 31-32.)[6]  Hence, both co-defendants should they have testified exculpating the inside guards, Loomis Fargo employees, would have been severely cross examined as to their statements in the government's version of facts [referring to acting together with] ("the employees of Loomis Fargo") and co-defendant Matos-Montañez [would also be cross-examined] as to the video [audio] (sic) produced in evidence ("the [guards] (sic) receiving money"). [There were no other guards as co-defendants in any of the other counts of the indictment but count I referring to a conspiracy robbery of a Hobbs Act hit against Loomis Fargo April 30, 2004 armored car robbery.]

Further, the strength of the government's case is cited as a critical factor to be examined in a new trial motion in the case of <u>United States v. Douglas Gorbea del-Valle.</u>  The court invites the parties to comment on the facts as the court remembered them:[7]

1. There was a co-conspirator/cooperator named Feliciano Santiago-Vázquez that stated that both defendants Figueroa Vega and Luis Monserrate Valentín went to see him to encourage a "hit"  against certain route, a hit meaning a robbery against an armored car.  They all went to visit a hoodlum called Ivan Bravo. Co-defendant Luis Monserrate-Valentín subsequently made a separate visit with the cooperator Santiago-Vázquez to Ivan Bravo relating to the hit.(Docket 575 p. 8-9.) [Docket 575 contains citations to the transcript.]
2. The route to be hit was precisely the route of inside guards Figueroa Vega and Luis Monserrate Valentín, Route No. 7, in Bayamón. (Docket 575 p. 10. (Javier Valentín was to be the messenger, but the record  is irrefutable that Route No. 7 of Bayamón was regularly operated by Figueroa and Monserrate.)
3. Several months later the hit was in fact made in that route with Figueroa and Monserrate [sic] [José Nuñez Hernández] acting as driver, acting as guards (messenger/driver). [Nuñez Hernández was a rookie on the route and balked at the

---

[6]  The word "employees of Loomis Fargo" was used at the plea colloquy (Docket 556 p. 82). The word "guards" was used by the cooperator and Matos-Montañez as participating and receiving money as to the Texaco hold up. (Docket No. 117 p. 31-32). (The only "hit" involving "guards" as potential defendants participant of the crime in any of the counts of the indictment was the Texaco Gas station robbery.)

[7]  See the court's Opinion and Order in the instant case at Docket 575 denying the defendants' Rule 29 motion.

assignment.][8]

4. The driver, one of the two co-defendants [sic][the driver was that day a rookie in serving Route 7, José Núñez-Hernández], violated company's rules by leaving the truck next to the road and the side walk within the Texaco gas station instead of next to the [Texaco] cashier's office as required. [It was the rookie driver on the route who violated company rules on the order of Figueroa-Vega, see discussion infra.] Although the gas station was full of customers when the truck originally arrived,  the truck remained out next to the road and the side walk for around over thirty minutes without making any effort to get near the cashier's office as required. (Docket 575 p. 14.)

5. One of the defendants [Figueroa -Vega] was outside the truck precisely in the moment when the attack took place, not at the cashier's office nor in the truck. See Docket 575 p. 15-16 n. 6.

6.  After the attack had successfully finished and all robbers were inside the escape car, one of the co-conspirators exists the escape car and butts with his rifle the face of a co-defendant [Figueroa -Vega] .  (Docket 575 p. 15.)

7.  Both co-defendants [[Figueroa -Vega]  knew that there were large amounts of money from [clients] called Joroma and Banco Popular delivered by the clients to the Loomis Fargo vault on the Wednesday and Thursday immediately before the hit to be returned to the clients precisely on Friday, the date that the robbery took place. The amounts of money were around $944,000.00 in signed [cash] receipts by co-defendant Figueroa; Monserrate [Valentin] was also serving with Figueroa on at least the Thursday immediately before the Friday robbery. See Ex. 106 and Ex. 105. (Docket 575 p. 16-17.) [All cash was entered into the Loomis Fargo vault on Wednesday and Thursday 28 and 29 of April, 2004, to be returned to the respective clients on April 30, 2004.]

8. Joroma and Banco Popular stops were regularly made within the route prior to the stops at Kmart or Home Depot (Rexville),[9] a place where the cooperator stated that "the plan was [originally] that we were going to **verify the route** and see whether the hit would be behind K-Mart or Home Depot." Docket 575 p. 8. The money of Banco Popular and/or Joroma would have exited the truck should co-defendants have made the hit at Rexville. [Hence, the "hit" was made at the Texaco

---

[8]     [Co-defendant Monserrate-Valentin, was not that day driving the armored car, he was excused due to union business.]

[9]     See generally the facts with specific references to the record developed by the court at Docket No. 575 including references to the transcript testimony of the cooperator (p.5-13) and references to the Banco Popular and Joroma clients, receipts of money signed by co-defendant Figueroa entering the vault of Loomis Fargo on Wednesday and Thursday to be returned, all the cash, to the clients on Friday, April 30, 2004, the date of the robbery. (p. 16-18.) Figueroa was the person signing the receipt on Wednesday and Thursday, Monserrate accompanied him at least in one of the two days. Ex. 105, 106 (route sheets containing the names of the driver and the messenger of the truck on the critical days of Wednesday and Thursday before the Friday robbery of the Loomis Fargo armored truck at the Texaco gas station).

gas station prior to the Rexville K-Mart or Home Depot.] (Emphasis ours.)[10]

The court invites the parties to discuss the criteria of "strength of the case" as set forth in  United States v. Douglas Gorbea del-Valle, ___F. 3d___, May 12, 2009, as the court understands that the facts must be examined to verify "actual probability that an acquittal would have resulted" all within the context of Gorbea del-Valle, Id.

The court adds ten (10) days to any prior term which the court may have granted to the co-defendants Javier Figueroa Vega and Luis Monserrate Valentín to submit their Memorandum of Law."

In the instant case, the case parallels the case of United States v. Montilla, 115 F.3d at 1067 wherein the evidence of a co-defendant who asserted his Fifth Amendment at trial is not "per se insufficient under Rule 33 as the evidence may be unavailable."  We heed to the advice "to hold. . . a hearing." Id. We stress, however, as stated infra that the evidence in the instant case is beyond merely "resting entirely on the testimony of the DEA informer." Id. The court uses,  amongst others, the criteria of "the weakness of the government's case . . . "significant efforts to procure co-defendant's testimony" and a "plausible explanation" as to why the evidence was not available." The court grants the last two criteria to the defendants and concentrates on the alleged "weakness of the government's case."

However, the court at United States v. Del Valle, 566 F. 3d at 38 reiterated the doctrine of United States v. Montilla, 115 F.3d at 1067-68, standing from the proposition that "such evidence must be regarded with "great skepticism," since "it is not unusual for the obviously guilty co-defendant to try to assume the entire guilt and [a] convicted, sentenced co-defendant [Salas-Fernández and Matos-Montañez a.k.a. "Ito"] has little to

---

[10]     The brackets are added to clarify or rectify the Order at Docket 613.

lose and perhaps something to gain from such testimony [the $944,000.00 product of the hit of April 30, 2004 has not been recuperated.] We share the general "skepticism" concerning those statements, and the present opinion by no means confers an automatic right in such a case "to a new trial or even to hearing" [the District Court granted a hearing in the instant case]. Montilla, 115 F.3d at 1067-68.

The standard for a new trial was recently reiterated at United States v. Del Valle, 566 F.3d at 38. The burden basically emphasizes that the defendant carries a "weighty burden" of establishing that:

    (1) The evidence was unknown or unavailable to the defendant at the time of trial;

    (2) failure to learn of the evidence was not due to lack of diligence by the defendant;

    (3) the evidence is material and not merely cumulative or impeaching; and

    (4) the emergence of the evidence will probably result in an acquittal upon retrial of the defendant.

The court for the sake of arguments assumes that co-defendants Figueroa-Vega and Monserrate-Valentín comply with the first three criteria. The issue is whether the evidence "will probably result in an acquittal upon retrial of the co-defendant." Del Valle, 566 F.3d at 68.

The court is of the opinion that the Plea Agreement and the plea colloquy of Salas-Fernández and Matos-Montañez  a.k.a. "Ito," (Dockets 352-2, 349 and 356) contain admissions as to the guilt of the "guards" together with statements as to the guilt of both defendants Figueroa-Vega and Monserrate-Valentín. Further, co-defendant Matos-Montañez, at an audio recording of him  riding in a car with a confidential informer, Ex. 117 and 118, bars any finding as to a probable result of "actual probability that an acquittal

would have resulted if the evidence had been available," <u>United States v. González-González</u>, 258 F. 3d 16, 20 (1st Cir. 2001) citing <u>United States v. Sepúlveda</u>, 15 F.3d 1216, 1220 (1st Cir. 2003).

The court explains. We first  provide the salient incriminatory evidence as to both co-defendants "Vega-Figueroa" and "Monserrate-Valentín." The court analyzes the incriminatory evidence in order to determine the strength or "weakness of the government's case." <u>United States v. Montilla</u>, 115 F.3d at 1067.

As was originally expressed by the court at Docket 575, the Opinion and Order of the court denying Rule 29 is strong against both co-defendants.

The court reiterates the highlights.

1. Both co-defendants were for various years prior to the facts the regular driver/messenger of Route #7 of Loomis Fargo.

2. A co-conspirator cooperator, Feliciano Santiago-Vázquez, stated that he received a visit of Figueroa-Vega and Monserrate-Valentín to hit Figueroa/Monserrate's route. (Docket 454, p. 111-114.) Santiago Vázquez was a co-worker, part-time truck driver working for the company Loomis Fargo for seven years. The robbery had been planned by Javier Figueroa-Vega, Luis Monserrate-Valentín. (Docket 454, p. 110-111.)  Figueroa-Vega and Monserrate-Valentín asked Santiago-Vázquez if he knew somebody to hit their route. (Docket 454, p. 115.) "The plan was that we were going to verify the route and see whether the hit would be behind K-Mart or Home Depot." (Docket 575, p. 8-9 quoting

Transcript, Docket 454.)[11]   All three went to visit Ivan Bravo. (Docket 454, p. 116-120, Docket 575, p. 9.) There was later another meeting between Santiago-Vázquez, Monserrate-Valentín and Ivan Bravo for further planning as to the route, the truck number and other conspiratorial related matters. See generally Docket 575, p. 5-19; Docket 454, p. 122-124. They also spoke about someone following, scouting, the route and talked about performing the robbery on a long weekend; the truck number was also discussed. (Docket 454, p. 119-124; Docket 575 p. 10-14.) Also, "Javier [Figueroa-Vega] was going to be a messenger that day . . . he is the one who picks up the money [from the clients and to and from the Loomis Fargo vault]." They were going to use three men from the gang of Ivan Bravo. The three men were introduced to persons known by Ivan Bravo. One of the persons then introduced at the meeting was co-defendant Edgardo Salas-Fernández, one of the assailants who having  pleaded guilty states as new evidence he did not know Figueroa-Vega nor Monserrate-Valentín. (Docket 454, p. 124-127; Docket 575, p. 10-11.) The messenger (custodian) had to be out of the armored car. (Docket 454, p. 127-128; Docket 575, p. 11.) The hit was allegedly a reprisal for the ill treatment received by the company to the operators of the armored truck. (Docket 454, p. 135-136; Docket 575, p. 12.)

3. The hit actually occurred at the Texaco gas station on April 30, 2004, because large amounts of money entered two days prior thereof  from two clients, one called

---

[11]   The defendants maintain that because the route was originally planned to be at K-Mart or Home Depot, and subsequently carried on at Texaco, there are two conspiracies. The court differs for many reasons, one of which is that the route "was going to be ver[ied]" and studied "to see whether the hit would be at K-Mart or Home Depot." The other reason is that "a conspiracy is totally different from the overt acts that may later follow." (Citations omitted.) See Docket 575 p. 4-5, Opinion and Order Denying Rule 29.

Joroma and a bank called Banco Popular. A total of $476,000.00[12] was entered into the Loomis vault on Thursday, April 29, 2004 from Banco Popular and a total of $468,225.00 entered from Joroma ($368,225) on Wednesday, April 27, 2004 and $100,000.00 on Thursday, April 29, 2004. All the monies were destined to be returned to Joroma and Banco Popular on Friday, April 30, 2004, as the receipts clearly indicated to be returned to the clients Joroma and Banco Popular on that day. See Docket 575, p. 15-18; see also Docket 577, p. 4-6, Denial of Bail as to Monserrate-Valentín. Monserrate-Valentín acted as the driver of the route on at least Thursday, April 29, 2004, Ex. 106. Monserrate-Valentin was the driver and Figueroa-Vega was the custodian/manager on Wednesday, April 28, 2004. (Ex. 105.)[13]  The stops at Home Depot and Rexville were frequently served after the Banco Popular and Joroma clients, (Ex. 4, 104, 106, 107). See Detail of Receipts and amounts at Docket 575, p. 16-18. The receipts from Joroma totalling $368,225 entered the vault on April 27, 2004 signed by J. Figueroa and were withdrawn from the vault on Friday (viernes) thereafter signed by J. Figueroa.  Another receipt of Joroma entered the vault of Loomis on 4/29/09 to exit on "viernes", Friday 30th, was also signed by J. Figueroa. The receipts of Banco Popular entered the vault on 4/29/2004 and were all withdrawn on 4/30 were also signed by J. Figueroa.

4. The determination to stop first at the Texaco gas station was made by Figueroa-

---

[12]    The court added wrongly the amount to be $486,000.00 instead of $476,000.00 at Docket 575 p. 17. The Joroma's monies added to $468,225,00 for a total of $944,225.00. But Nestor Medina, the General Manager, testified that Route sheets No. 105 and 106 of April 28th, 2004 show that on these dates Javier Figueroa and Luis Monserrate acted as messenger/driver.  (Docket 461, p. 105-106.)

[13]    The court clarifies that Dockets 105 and 106 have two dates 4/27 and 4/28/2004, using either dates Monserrate was present on either Wednesday or Thursday of the week.

Vega. A rookie driver in Route No. 7 was assigned replacing the regular driver Monserrate-

Valentin. He was Mr. José Núñez-Hernández.[14]  Núñez, eventually accepted to ride as the

driver of Figueroa-Vega stated "you get the truck, I will take the route." Further, Figueroa-

Vega designated the gas station (Texaco) to the rookie driver as the first stop of the route.

(Docket 455, p. 46.) Figueroa-Vega also suggested to park the truck next to the sidewalk

near the road as the gasoline station was full with clients even though the orders call for

the truck to park next to the door of the client. (Docket 455, p. 46.)   The truck remained

for around 27 to 30 minutes in the same position in the sidewalk next to the street. (Docket

455, p. 61.) (See photo, Ex. 9); an extremely convenient place for performing a robbery hit.

No effort was made to move the armored car during all the time the armored truck was next

to the road. Nuñez stated that he did not move the truck because "I asked him [Figueroa-

Vega] if I should stay there, and I did stay there." (Docket 455, p. 61.)[15]

    5. Figueroa-Vega was outside the armored truck when the hit suddenly occurred,

as had been originally suggested by Ivan Bravo when he spoke with Monserrate-Valentin

a few months prior thereto. (Docket 455, p. 51-54.)   The head of Figueroa-Vega was

placed in front of a wheel to prevent the truck from moving. (Docket 455, p. 54.) The driver

was told to open the door or Figueroa-Vega would be shot. (Docket 455, p. 54.)  But co-

defendant Matos-Montañez later said this was "playing around" with Figueroa-Vega by the

robbers. (Ex. 117.)  Curiously as the robbers were leaving in the escape car, as they were

---

[14]    Núñez-Hernández had never served Route 7. He had been a part-timer for many years
but balked at serving that route, when the same was assigned to him. (Docket 455, p. 45
et sec.)

[15]    Two employees of the gas station stated that they had never observed the armored car
that distant from the offices of the Texaco gas station. (Docket 575, p. 15.)

already in the escape car, one of the assailants exits the escape car and hits with a rifle Figueroa-Vega and then immediately returns to the escape car. The driver José Núñez-Hernández described the incident relating to the assailant returning to hit Figueroa-Vega. (Docket 455, p. 56.) In the plea of Matos-Montañez and it is recognized by him that the incident to hit Figueroa-Vega was designed to draw "suspicion" away from Figueroa-Vega. (Docket 353-2, p. 11.)

Ricardo Torres-Ortiz had surveyed prior to April 30, 2004, route No. 7 as suggested by Ivan Bravo. (Docket 575, p. 14) He also was an FBI informer starting in early January 2005. Id.  p. 129.  Ricardo Torres admitted he scouted the area and told so to witness Anibal López-Narvaez  (Docket 463, p. 67-68) (originally he stated the route was the route "towards Naranjito.") Prior thereto the witness Lopez-Narvaez stated it was a route from Comerio to Naranjito, that he said it was the route of Bayamón, (Id. p. 128),  after López-Narvaez also identified Ricardo Torres-Ortiz by photograph. Id. p. 46.  Ricky also stated he was to meet with "guards" from Wells Fargo. Id. p. 46. The information for the robbery was being supplied by Ivan Bravo whom the witness identified via a photograph. Id. 68-69. The original escape vehicle was identified by José Núñez, (Ex. 10, photograph; Docket 455, p. 64 identifying a photograph of the escape vehicle.)  The assailants transferred to another minivan as observed by a lady witness providing the license plate who called the police. This car was abandoned next to the Seven-Up Factory in Bayamón with licence plates officially registered with the state authorities the ownership of to co-defendant Ricardo Torres.   DNA analysis of a  sky mask found in the minivan matched that of co-defendant Ricardo Torres-Ortiz.   Further, DNA found from a baseball cap within the minivan could not exclude co-defendant Hernández-Albino. Another witness stated that

15

Angel Salas-Echevarria, a witness, stated that his cousin Salas-Fernández, a.k.a. Baby, told him that he participated in the robbery at Lomas Verdes, Bayamón, on April 30, 2004.

6. The phone records of co-defendants Ricardo Torres-Ortiz, Edgardo Salas-Fernández, Xavier Hernández-Albino, and Luis Matos-Montañez, all participants in the Hobbs Act robbery of the Loomis Fargo armored truck of April 30, 2004, reflected various cellular phone calls amongst then in the early morning hours of April 30, 2004. Rodolfo Villanueva-Olivo, also a defendant, revealed that he called Torres-Ortiz on this same date and hours. No phone calls were detected as to Figueroa-Vega and Monserrate-Valentín. But they are both normal high potential suspects in armored car robberies. See Docket 575, p. 19 n. 9.

The court concludes that as in <u>Del Valle</u>, 566 F.2d 66, that "the government's case was not weak. . ."

The court proceeds now briefly to analyze the incriminating testimonies of Luis Matos-Montañez a.k.a. "Ito" and Salas-Fernández a.k.a. "Baby" through their individual plea agreements as to co-defendants Figueroa-Vega and Monserrate-Valentín. The court also analyzes the audio tape Monserrate-Valentín, (Ex. 117), with confidential informer Alexis Irene- Ojeda on the same subject matter as to both Figueroa-Vega and Monserrate-Valentin. (Docket 463, Transcript of Testimony.)

Notwithstanding the court clarifies co-defendants Salas-Fernández and Matos-Montañez exclusively testified at the new evidence trial that they did not have any knowledge that Monserrate-Valentin and Figueroa-Vega had participated as co-conspirators in the conspiracy. But even if they denied having known them at all, as a matter of law it is immaterial that all co-defendants within a conspiracy know each other or

what their particular functions were within the conspiracy. United States v. Soto-Beniquez, 356 F.3d 1, 18-19 (1st Cir. 2004); United States v. Sánchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2009), citing Soto-Beniquez, Id.  ("It is not necessary that each conspirator knew or had contact with all the members. Nor . . . [it is required]  that the conspirators knew all the details of the conspiracy or participated in every act in furtherance of the conspiracy.") Sánchez-Badillo, 540 F. 3d at 29. In fact, secrecy is part of a conspiracy and sometimes the principal leaders do not deem pertinent to reveal to all the conspirators the identity of all or some of the conspiracy.

Co-defendant, Edgardo Salas-Fernández a.k.a. "Baby" "Bebe" in the Spanish language signed a plea agreement on March 20, 2008 (Docket 349), including a government version of facts, (Docket 549, p. 9-10).   Prior to the court accepting his responsibility the court entered into an extensive colloquy with him and all of the defendants who plead to all counts, excluding only the Loomis Fargo guards of the armored truck who did not plead and exercised their constitutional right to a trial. (Docket 656). The defendant Salas-Fernández accepted that his lawyer Mr. Hasse had duly translated to him the plea agreement and had explained the same to him, (Docket 656, p. 42-43).   Salas-Fernandez  was further informed by his counsel that he accepted the robbery count (Count III) and the weapons count (Count IV); he would consequently be facing a total of nine years under a "C" plea.  (Docket 556, p. 43).   Other counts were to be dropped.  He was further explained the nature of a "C" plea by the court, (Docket 556, p. 63). The co-defendant Salas-Fernández accepted in his written plea, (Docket 349, p. 10), that "one of the **defendants assaulted [3] Javier Figueroa-Vega in order to draw**

17

**suspicion coming from Figueroa-Vega."**   The monies were divided "by all participants in the robbery including the employees of Loomis Fargo who provided the route and identifies the number of the truck robbed." (Docket 349, p. 10.)   However, there are no other Loomis Fargo employees charged in Count I relating to  the conspiracy as to the armored truck robbery of "April 30, 2004" but the co-defendants Figueroa-Vega and Monserrate-Valentín who regularly acted as the guards of that route.[16] Further and most critical, there was evidence that Figueroa-Vega and Monserrate-Valentín were the Loomis Fargo employees who provided the details as to Route 7 including the identification of clients and the order and manner that the route was served. Further, one of the assailants of the Texaco Loomis Fargo armored truck being already in the escape vehicle, after the robbery had been finished, got out of the escape vehicle to hit with the rifle Figueroa-Vega and afterwards returned to the escape vehicle all in order to "draw suspicion away from Figueroa-Vega" as expressed in the government's version of facts of Salas-Fernandez at Docket 349, p. 10. See also testimony of Núñez-Hernández, (Docket 349, p. 10).  The testimony of Edgardo Salas-Fernández can hardly produce "actual probability that. . . an acquittal would. . .result if the evidence had been available. <u>Del Valle</u>, 566 F.3d at 38, quoting <u>González-González</u> at 258 F.3d 20.

---

[16]   At the plea colloquy the AUSA narrated the government's version of facts as to all who accepted the conspiracy count and/or Count III at Docket 446, p. 82 "members of this agreement etc. . ." At one point in describing the act of the agreement AUSA stated: "During the robbery the defendants used an AK 47 and a handgun, pointed the weapons at Nuñez-Hernandez [the driver], threatened to kill him and pretended to kill Javier Figueroa-Vega if Nuñez-Hernandez did not open the truck." (Docket 556, p. 83.) Later the AUSA stated: "Before leaving the scene of the robbery, one of the defendants assaulted Javier Figueroa-Vega in order to draw suspicion away from Figueroa-Vega." (Docket 556, p. 84) (similar to the language used in the written plea agreement of Edgaro Salas-Fernandez at Docket 349, p. 10. Salas-Fernandez accepts responsibility at Docket 556, p. 88.)

As to witness co-defendant in the same instant crime as co-defendants Figueroa-Vega and Monserrate-Valentín, co-defendant Luis Matos-Montañez, the court asked him if he was threatened, forced, coerced or induced to when he accepted responsibility and entered into a plea agreement. He answered no. (Docket 556, p. 41-42.) He was also asked if any co-defendant threatened or coerced him to enter into a plea. Co-defendant Matos-Montañez answered no. Id. Co-defendant Matos-Montañez was also explained by the court the nature of a "C" plea. (Docket 556, p. 45.) Matos-Montañez was also advised by the court that all charges against him were felonies. (Docket 556, p. 45-46.) Counsel Aguayo informed the court that he had translated the plea to him as to all four counts he was pleading to. (Docket 556, p. 39-41.) The plea agreement clearly stated that he was pleading to counts two, three, nine and ten of the indictment. (Docket 353-2.)

Counsel Aguayo was asked by the court if he understood that his client Matos-Montañez was competent to make a knowing, voluntary, and willful plea. He stated that based on his "prior and up today, [interactions], "I think he is totally competent." (Docket 556, p. 38.) The court asked counsel Aguayo the terms of the plea colloquy. Counsel stated that he was pleading to counts two, three, nine and ten, and he was to receive a "C" plea; he would be sentence to eighteen years. The court also reiterated to counsel the meaning of a "C" plea, meaning that the court had the option to accept or reject the plea, if the court rejects the plea Matos-Montañez could withdraw the plea. Matos-Montañez was present standing next to his counsel Aguayo. Matos-Montañez also agreed to a waiver of appeal if the court accepted the plea and sentenced him to what he agreed. (Docket 556, p. 40. ) (See also Plea Agreement, Docket 353-2, p. 7-8.)

Co-defendant Matos-Montañez signed a plea wherein he accepted at the colloquy

19

that said plea was fully explained and translated by his lawyer which stated that "employees of Loomis Fargo & Co. of Puerto Rico" had conspired in the agreement "to rob the Loomis Fargo armored truck." (Docket 353-3, p. 10.)  Further, he also accepted that the assailants "pretended to threaten to kill co-defendant Javier Figueroa-Vega if  Núñez did not open the truck [armored vehicle] to allow them to take the money. . ." (Docket 352-2, p. 11).[17]  The plea agreement also stated that the crime was committed with "Ricardo Torres-Ortiz, Edgardo Salas-Fernández, Xavier Hernández-Albino and others including **employees of Loomis Fargo & Co. of Puerto Rico.**" (Emphasis ours.) Id. P. 10. (Docket 352-2.)   The plea agreement of Matos-Montañez further stated that "the money stolen from Loomis Fargo on April 30, 2004, that is, the $944,225, were divided by all participants including the employees of Loomis Fargo who provided the route and identification number of the robbed and co-defendant Matos-Montañez who planned the robbery. (Docket 352-2, p. 12.)  At the colloquy, Matos-Montañez accepted that the plea agreement was duly translated to him by counsel Aguayo. (Docket 556, p. 41.)  The court also advised co-defendant Matos-Montañez his constitutional rights associated with a trial. (Docket 556, p 76-79.)  At the government's version of facts, stated by the AUSA at the plea colloquy, the defendant Matos-Montañez accepted that  "he also obtained [sic] [had] the information as [to] the other co-defendants **from the employees of Loomis Fargo Incorporation [sic] of Puerto Rico and participated in the robbery of April 30, 2004 together with** (the remaining co-defendants). . ." (Docket 556,  p. 88.) Matos-Montañez further accepted that "Before leaving the scene of the robbery one of the defendants assaulted co-

---

[17]  Similar to the acceptance of the government's version of facts of co-defendant Salas-Fernández at Docket 349, p. 9.

defendant Javier Figueroa-Vega in order to draw suspicion away from Figueroa-Vega." (Docket 352, p.11.) There were no other employees of the company Loomis Fargo indicted as to Count I, the Hobbs Act conspiracy, and Count III, the substantive Hobbs Act interference on commerce via a robbery held on April 30, 1994 but co-defendants Figueroa-Vega and Monserrate-Valentín.

Further, there was an audio conversation of Matos-Montañez together with an FBI informer, Alexis Irene Ojeda, held in an automobile. (Ex. 117.) Should the co-defendant Matos-Montañez testify he would be confronted with several damaging evidence which he admitted as to co-defendant Figueroa-Vega and Monserrate-Valentín. The evidence stems from (Ex. 117) and the audio recording as to the conversation of Matos-Montañez and the informer Alexis Irene-Ojeda relating to Matos-Montañez's participation in Count III, the substantive Hobbs Act violation that occurred on April 30, 2004. The court briefly provides the highlights.

The transcript of the audio (Ex. 117) states, attributed, to the C.W. (Alexis Irene-Ojeda) that "Ricky", co-defendant Ricardo Torres-Ortiz, and Figueroa-Vega "allegedly played" referring to the camouflage of positioning Figueroa-Vega under the wheels to force the truck driver (Núñez-Hernández) to open the door of the armored car all relating to "the station"– the Texaco gas station. L.M., Luis Matos-Montañez states "Ah, Yes." (Ex. 117, p. 26.) Then Matos-Montañez states that "Ricky" made a huge mistake by "he got off. . .in front of a school" meaning that somebody could have been there and observed the exchange (the robbery occurred early in that morning). The narrative of Matos-Montañez actually occurred with a lady who saw the exchange. "With the money and all the people saw. That's why they called and gave his licence plate" and then he compounded the

problem "by reporting it" and "got fucked" meaning that he was trapped by the authorities because the licence plate of the car was registered in his name and he reported it as allegedly stolen. (See fact number 5, p. 13-14 infra of this opinion referring to the licence plate of the last transfer car used in the hold up. (Ex. 117, p. 26-27.)  Monserrate-Valentín knew exactly what transpired at the gas station and the errors committed by the gang leading to their arrest. "That's why they caught them" – again a response of Luis Matos-Montañez. (Ex. 117. P. 28.)  Luis Matos-Montañez is also concerned at that time, not yet been arrested as May 2, 2007, (the date of the taped conversation), that "my name is messed up around there" the court would have preferred a better translation "my name is doomed around there." (Exhibit 117, p. 28). He was also concerned that according to Irene-Ojeda, "Baby" – Edgardo Salas-Fernández "is going to raise his hands." (Ex. 117, p. 28-29.) He apparently told it to "Xavier" co-defendant Xavier Hernández-Albino– all according to the C.W. who immediately tells him not to go to Xavier's house as the house may be hot. Id. But "Baby," according to Luis Matos-Montañez, "can't raise his hands. He has to wait for someone to accuse him. . ." (Ex. 117 (a), p. 29.) Ironically Matos-Montañez states "That's federal. That's not to. . . dealing with a confidential information. .. Man, that's federal." (Exhibit 117(a), p. 30.)

As to the persons in the "van", ill translation from "guagua," Matos-Montañez  says "Man everybody there has something to do with it. Everyone there took money. But, regretfully from this side they don't know anyone. They can't say they know. ..they offered him [Andrés] something and they didn't comply. . ." Referring to the fact that Matos-Montañez thinks that they (the guards) do not know anybody from this side meaning the outside gang. (Docket 117, p. 31-31.)  However, Matos-Montañez obviously did not know

that Edgardo Salas-Fernández had been previously introduced to both Feliciano Santiago-Vázquez and Luis Monserrate-Valentín.

But regardless of any other matter the non-rehearsed statement, non-prepared statement made by Matos-Montañez,  as to a comment made by the C.W., as to that, "There the guards has something to do with it right. They're fucked there."  The response of Matos-Montañez "But I know that everyone got money and . . . they were also fighting because **those people got payed a lot of money**." (Emphasis ours.) The C.W. asks: "The ones from the van?" Matos-Montañez states "yes. (Pause) They were talking shit, no that. . . you see. . . they payed those people too much. That they had to pay them less." (Ex. 117, p. 32.) Referring to the persons in the van (the persons in the armored truck) as later clarified by testimony of the C.W. (See infra.) Finally Matos-Montañez states: "No. Regretfully. . . with those things I. . .I know about everything. All of the ones that have happened from November and this way. . .I have to do with all. And those things, **I take them and sell them.** I know." (Ex. 117, p. 33.) (Emphasis ours.)  Matos-Montañez was, therefore, organizing and selling the hits on armored trucks.

It is, therefore, not surprising that Luis Matos-Montañez accepted a guilty plea as all substantive Hobbs Act robberies relating to the armored cars. (Docket 353-2.)

The defendant Matos-Montañez accepts responsibility not only for all the Hobbs Act "since November until this way" meaning May 2007, the date of the audio tape, but also accepting that he sold the Arecibo  armed robbery which was one of the armored robberies. (Ex. 117, p. 34.)

Finally, Matos-Montañez accepts that he is the boss. Matos-Montañez is described

as "you are the boss" "el jefe" by C.W.– Matos-Montañez responds: "the same uni and like that. Bang, bang, this is like this, like this and like this. Why do you think that. . . that happened now? Nothing, the same way, and that." Clearly an acceptance by stating "this is like this, like this and like this."

The C.W. in his testimony states as follows relating to the audio tape with Luis Matos-Montañez: As to the persons "playing around" this occurred at the "gas station" at p. 26 of the transcript of Ex. 117, states that "Ricky" was the person identified in Ex. 20, Ricardo Torres-Ortiz defendant number 1, and "Bebe" was identified as the person in Ex. 17, Edgardo Salas-Fernández. The station refers to the "gas station" in Bayamón "and the licence plate of "Cano" is the licence plate of "Ricky" at p. 27 of the Ex. 117. See transcript of Irene Ojeda, Docket 463, p. 162- 170.  Referring to "Andres" at p. 32,  that refers to an Andres who was offered money to steal a van that was used as the initial escape vehicle. He was offered money but the people "they offered him an amount but they gave him another." Ex. 117, p. 32. The van was stolen by the informer and Andres. The C.W. did not know the purpose and use of the stolen van. Ito, Matos-Montañez, was helping the change of tires of the vehicle. (They put on older tires in the escape vehicle and placed the "new ones in Ito's truck." The word "van" used by the C.W. at p. 32 refers to "guagua" in Spanish refers to the "armored truck."– (Docket 464, p. 8-13).  The "new one" at p. 32 referred to the armored truck robbery at Western Bank as to amounts of payments received by Luis Matos-Montañez. When the number "two and a half" is used by them (C.W. and Matos-Montañez) it means $250,000.00– and the number "one and a half" $150,000.00. The hold up in "Arecibo" meant the hold up in of the U.S. Post Office in Arecibo. "One dollar" means $100,000.00. (Docket 464, p. 8-32.) (All referring to the amounts of money received by

24

Matos-Montañez to sell the armored car hits.)

The transcript at Docket 464, p. 36-37, further clarifies Matos-Montañez role as organizer/leader in the Wetern Bank hold up, Count I; the Arecibo Post Office hold up, Count IX, and the drive in Plaza (Shopping Center) hold up, Count II. Matos-Montañez accepted responsibility as to all the armored truck robberies in the indictment including that occurring at the Texaco gas station. (Docket 352-3.)

## CONCLUSION

The facts in the instant case present a strong case against co-defendants Figueroa-Vega and Monserrate-Valentín. Contrary to the case of United States v. Montilla, 115 F. 3d 1060:

1.  Both co-defendants Figueroa-Vega and Monserrate-Valentín went to see Feliciano Santiago-Vázquez to organize a hit against Route 7 which operated from the town of Bayamón to Naranjito to Comerio. Figueroa-Vega and Monserrate-Valentín were the regular messengers and drivers of Route 7 for many years prior to the assault on April 30, 2004. Feliciano Santiago-Vázquez was also a part-time driver for seven years prior to the meeting. All three were looking for someone to hit the route. They were looking for a hoodlum who could organize the route.

2.  Feliciano Santiago-Vázquez then went to see Ivan Bravo. "The plan was that we were going to verify the route and see whether the hit would be behind K-Mart or Home Depot." There was a later visit between Santiago-Vázquez, Monserrate-Valentín and Ivan Bravo for further planning. They agreed to have someone scout the route; they also agreed to perform the hit on a

weekend (the truck would carry larger amounts of money. "Javier Figueroa was going to be the messenger. . . (He was the messenger on the day of the hold up.") They were going to use three men from the gang of Ivan Bravo. They introduced at this subsequent meeting three men. One of the persons was identified via a photograph by Feliciano-Vázquez as Edgardo Salas-Fernández who actually was one of the assailants of the later carried on assault and plead guilty to precisely the hit on the armored car on April 30, 2004 at the Texaco gas station. It was previously agreed that the messenger, Figueroa-Vega had to be out of the armored car. He was outside the armored car the date of the assault. Further, as originally planned by Ivan Bravo, Ricardo Torres-Ortiz, one of the assailants, surveyed Route 7 prior to the assault.

3.      The hit actually occurred at the Texaco stop of the Route 7 in Bayamón on Friday, April 30, 2004. It was on a week end. The truck was loaded with cash from two customers of Loomis Fargo. Joroma had loaded $368,225 in monies on Wednesday, April 28, 2004 to be deposited in the vault of Loomis Fargo and to be returned to Joroma on Friday of that week (Ex. 100). Joroma deposited an additional $100,00 on Thursday, April 29, 2004, also destined to be returned on Friday, ("viernes 30"), April 30, 2004. (Ex. 100.) Banco Popular loaded on Thursday, April 29, 2004, the amount of $476,000 to be returned on the next day, Friday, April 20, 2004 (Ex. 105 and 106 respectively). The route sheets for Wednesday, April 28, 2004 and April 29, 2004 reflect that Figueroa and Monserrate were the messengers and drivers

26

on both of those days. (Docket 461, p. 105-106).[18] All receipts of monies as to Joroma and Banco Popular were signed by Figueroa-Vega entering the truck. He also knew by the receipts that they were to be returned to the clients on April 30, 2004.  (Ex. 100). The hit was made on the Texaco stop on this date. The hit strategically could not be made at K-Mart or Home Depot on this date since those stops regularly occurred after the stops of Joroma and Banco Popular, hence, the armored truck would have been without the monies of Joroma and Banco Popular to be returned on this date.

4.    The hold up. Because Monserrate-Valentín was to be in union business, a rookie driver on the route was assigned. He was a part-time driver Núñez-Hernández who did not like the assignment.  Núñez-Hernández had not worked the route before.  But he eventually accepted after attempting to excuse himself. FIgueroa-Vega determined that the gas station would be the first stop. Figueroa-Vega stated to the driver that "you get the truck, I will take the route." Figueroa-Vega then gave the orders as to the logistics of parking the truck next to the sidewalk. The gas station was full. But the truck never moved from next to the sidewalk and the street entrance to the gas station to make an effort to move next to the door of the offices of the gas station unquestionably as required by the regulations of the company for safety purposes. The truck remained there for 27 to 30 minutes.  Leaving the truck next to the street was very convenient for a hold up. Núñez-Hernández

_____

[18]    Testimony of Nestor Medina identifying the person who were the driver/messenger respectively on those two critical days.

stated he did not move the truck because "I asked him [Figueroa] if I should stay there, and I did stay there." (Docket 455, p. 6.)

As originally planned, Figueroa-Vega was outside the truck precisely when the hold up robbery occurred and he was acting as messenger.[19] The head of Figueroa-Vega was then place under the wheel with a weapon at his head to force the driver to open the truck. The driver, Núñez-Hernández, yielded. The assault occurred, the money was quickly transferred to the escape vehicle.

Another curious fact occurred. The assailants were all in the car ready to leave. But one leaves the car, goes to the armored truck area and hits Figueroa-Vega.

Because "Ricky", co-defendant Ricardo Ortiz-Torres, left his licence plate in a car and because they executed a transfer of cars a point next to a school, a lady observed the transfer of one of the assailants, they were eventually arrested. Further, DNA connected Ricardo Torres-Ortiz via a mask left in one of the abandoned escape cars and DNA in a baseball cap also connected co-defendant Hernández-Albino. Salas-Fernández admitted to having participated in the robbery to his cousin Angel Salas-Echevarria.

Hence, contrary to co-defendants' allegations, the case is strong against both co-defendants.

The court is of the opinion that the proffered evidence to be provided by Salas-Fernández and Matos-Montañez fail to reach the threshold of "actual probability that . . . an acquittal would . . . .result if the evidence had been available." They both made admissions in their written plea that "employees of Loomis Fargo & Co. of Puerto Rico

---

[19]  Figueroa-Vega being outside, acting as a messenger, was not a coincidence. It was precisely the plan as designs by Ivan Bravo months prior to the actual assault.

were involved" and that "before leaving the scene of the robbery one of the defendants assaulted co-defendant [3] Javier Figueroa in order to draw suspicion away from Figueroa-Vega"– the court adds– "[an employee] of Loomis Fargo...] Further, at the plea agreement colloquy the admissions as to Figueroa-Vega and Monserrate-Valentín were reiterated including that the moneys were divided amongst "including the employees of Loomis Fargo."

Finally, Matos-Montañez made admissions in Ex. 117, the audio of a consensual conversation, as to "obtain[ing] information from employees of Loomis Fargo." He also accepted that "Ricky," co-defendant Ricardo Torres-Ortiz and Figueroa-Vega where "playing around" under the wheels of the armored truck to force the truck driver to open the truck as to facts that occurred at "the station" clarified to be the "gas station" by the C.W., Irene Ojeda. Finally, Matos-Montañez accepts that, who showed total knowledge at the audio tape, Ex. 117, that he knew exactly why the assailants were trapped by the police, stated that "those people got payed a lot of money ['the ones from the van'] [referring according to the C.W. as to the "armored truck"– the "guagua."]

Finally, the jury would be instructed that co-conspirator do not have to all know each other or what their particular jobs were within the conspiracy.

The court, therefore, can not yield to co-defendants' request for a new trial under Fed. Cri. Proc. R. 33 as the court is of the opinion that the threshold is not met as to "the interest of justice requir[ing] a new trial" under United States v. Montilla, 115 F.3d at 1067 (quoting) United States v. Quimette, 753 F.2d 188, 192-193 (1st Cir. 1985).

Defendants Figueroa-Vega and Monserrate-Valentín's Motion for New Trial under Rule 33 is, therefore, **DENIED.**

Sentencing is scheduled for December 28, 2009, at 9:30 a.m.

**IT IS SO ORDERED**.

San Juan, Puerto Rico, this 13th day of November 2009.

s/ Daniel R. Dominguez
**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**